# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | MDL No. 24-3110 (JWB/DTS) |
| This Document Relates To:<br><br>All Class Actions | **MASTER CONSOLIDATED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ..................................................................... 2

II.   PARTIES ................................................................................................... 5

    A.    Plaintiffs ......................................................................................... 5

        1.    Direct Purchaser Plaintiffs ................................................. 5

        2.    Commercial Indirect Purchaser Plaintiffs ......................... 6

        3.    Consumer Indirect Purchaser Plaintiffs ............................ 6

    B.    Defendants ...................................................................................... 7

        1.    Producer Defendants .......................................................... 7

        2.    Commodity Defendants..................................................... 11

        3.    Agents and Co-conspirators ............................................. 12

III.  JURISDICTION, VENUE, AND COMMERCE .................................... 13

IV.  FACTUAL ALLEGATIONS ................................................................. 14

    A.    The Market for Granulated Sugar in the United States............... 14

    B.    The Defendants Have Market Power ........................................... 16

    C.    Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States. ........ 18

        1.    Defendants Unlawfully Shared Confidential Price and Sales Information With Each Other.................................... 18

        2.    Defendants Relied Upon the Exchanged Competitively Sensitive Information.................................................... 35

        3.    Defendants Agreed to a Common Formula to Fix Prices. .............. 38

        4.    Sugar Prices Increased in Parallel During the Class Period and by More Than a Competitive Market Would Allow............................. 40

    D.    Additional Plus Factors Support the Existence of a Conspiracy................. 49

        1.    The Market is Highly Concentrated, and the Defendants Are the Dominant Firms.................................... 50

        2.    Barriers to Entry Are High. .............................................. 51

        3.    Demand for Sugar is Inelastic. ........................................ 51

        4.    Defendants Are Vertically Integrated. ............................ 52

        5.    Defendants Had Numerous Opportunities to Collude. .... 52

        6.    Granulated Sugar is a Commodity. .................................. 54

      7.     There is a History of Anticompetitive Conduct in the Sugar Industry. ........................................................................................ 56

   E.    Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act .................................................................. 58

   F.    The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible ............................................................................................. 63

   G.   Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs and Members of the Classes to Suffer Antitrust Injury and Damages ............... 65

V.    LIMITATIONS AND TOLLING ........................................................... 66

VI.   CLAIMS FOR RELIEF ......................................................................... 68

VII.  PRAYER FOR RELIEF ......................................................................... 72

Plaintiffs[1] jointly, on behalf of themselves and all others similarly situated (the "Classes" or "Class Members"), upon personal knowledge as to the facts pertaining to themselves and upon information and belief based on investigation of counsel as to all other matters, bring suit against Defendants ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"), Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial" or "U.S. Sugar Savannah"), Louis Dreyfus Company LLC ("Louis Dreyfus"), Michigan Sugar Company ("Michigan Sugar"), United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United," together with ASR/Domino, Imperial, Louis Dreyfus, and Michigan, the "Producer Defendants"), Commodity Information, Inc. ("Commodity"), and Richard Wistisen ("Wistisen," together with Commodity, "Commodity Defendants," and together with the Producer Defendants, "Defendants"), for violations of Sections 1 and 3 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1, 3.[2]

## I.    NATURE OF THE ACTION

1.    This lawsuit arises from Defendants' unlawful agreement to raise, fix, maintain, and/or stabilize the prices of "Granulated Sugar," as the term is defined below, in the United States from at least as early as January 1, 2019, and continuing to the date

---

[1] "Plaintiffs" includes the Direct Purchaser Plaintiffs, Commercial Indirect Purchaser Plaintiffs, and Consumer Indirect Purchaser Plaintiffs.

[2] The Commercial Indirect Purchaser Plaintiffs and the Consumer Indirect Purchaser Plaintiffs also bring claims for violations of state law, which shall be set forth in their respective Short-Form Complaints, by Order of the Court. *See* ECF No. 315.

upon which any class is certified by the Court ("Class Period").

2.      To implement their price-fixing conspiracy, Defendants exchanged detailed, competitively sensitive, non-public information about Granulated Sugar prices, capacity, sales volume, supply, and demand, in addition to other conduct alleged herein.

3.      An agreement to share, and the sharing of, competitively sensitive, non-public information among horizontal competitors is itself an unlawful information exchange that is an independent violation of Section 1 of the Sherman Act.  The Producer Defendants' agreement to share, and the sharing of, confidential price, sales, supply, and demand data with their competitors demonstrates an effective enforcement mechanism of a price-fixing scheme.

4.      The Commodity Defendants provided the Producer Defendants with access to a clearinghouse of real-time information on current and forward-looking, non-anonymized data from competitors. The Producer Defendants agreed to use Commodity's clearinghouse to access the non-anonymized data to fix and maintain Granulated Sugar prices among them.

5.      The Producer Defendants acted upon this agreement by sharing specific information, through Commodity, on the Producer Defendants' profits, prices, costs, production levels, and sold positions[3]—all of which are key metrics and highly competitively sensitive information in this market that competitors would not share with

---

[3] A sold position, as applied here, is the percentage of a seller's supply of Granulated Sugar that is no longer available to purchase. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward.

each other in the absence of an agreement.

6.      The information gathered and disseminated through Commodity was made available only to subscribing sugar producers and is completely unavailable to the public or other sugar suppliers. In other words, Commodity and the Producer Defendants that were its customers engaged in a "give to get" scheme, where they gave one another mutual, reciprocal assurances that they would provide competitively sensitive information so long as their competitors also did so.

7.      Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit the use of an intermediary to do the same. Simply put, the Producer Defendants cannot use an intermediary to shield their information exchange from antitrust liability.

8.      It was contrary to the Producer Defendants' self-interests to share such competitively sensitive information with horizontal competitors. The reciprocal and mutual agreement, and sharing of such information, facilitated and maintained a price-fixing conspiracy and reassured each Producer Defendant that its co-conspiring counterparts would adhere to the conspiracy. The ubiquitous sharing of such information, as in this case, served an important monitoring and enforcement mechanism for the cartel.

9.      In addition to sharing competitively sensitive information that would not be in their unilateral self-interests, additional plus factors support the existence of a price-fixing conspiracy: the structure of the Granulated Sugar industry is vertically integrated and highly concentrated, barriers to entry are high, sugar is a commodity product for which the demand is inelastic, and the Producer Defendants had numerous opportunities to

collude, including through meetings at trade organizations.

10.    Indeed, Defendants were able to successfully implement their conspiracy because the sugar industry is structurally susceptible to collusion. In fact, for more than 80 years, the industry has been marked by repeated violations of the antitrust laws, including conduct remarkably similar to that alleged here.

11.    This information sharing also allowed Producer Defendants to coordinate their pricing strategies based on the prices of raw sugar futures contracts, as discussed below.

12.    As a result of Defendants' conspiracy, Granulated Sugar prices reached all-time highs during the Class Period. In fact, shortly after United retained Commodity's services in 2019, Granulated Sugar prices experienced one of the steepest climbs ever with nominal retail prices of Granulated Sugar in the U.S. rising 69% between January 2019 and October 2024.

13.    Among the victims of the conspiracy are Consumer Indirect Purchasers (e.g., retail purchasers), Commercial Indirect Purchasers—including restaurants, bakeries, coffee shops, and confectionaries—and Direct Purchasers, all of whom paid more for Granulated Sugar during the Class Period than they would have paid in a competitive market but for the unlawful conspiracy and acts in furtherance alleged herein.

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Direct Purchaser Plaintiffs

14.    Plaintiffs KPH Healthcare Services, Inc. ("KPH"), Northern Frozen Foods,

Inc. d/b/a Northern Haserot ("Northern"), Wakefern Food Corp. ("Wakefern"), Redner's Markets, Inc. ("Redner's"), and C.A. Curtze Co. ("Curtze") purchased Granulated Sugar directly from one or more of the Producer Defendants that was sold at prices artificially inflated by one or more of the Producer Defendants or their co-conspirators during the Class Period.

### 2.   Commercial Indirect Purchaser Plaintiffs

15.   Plaintiffs Union LLC d/b/a Union Hospitality Group; Piala LLC; Pattibakes LLC; WNT, LLC; WNT Farmington, LLC; The Union Public House, LLC; Natile Inc. d/b/a Alpine View Family Restaurant; Portland Hunt-Alpine Club, LLC; Morelos Bakery LLC; Up at 4, Inc. d/b/a Great Harvest Bread Co.; Gladys' Restaurant, LLC d/b/a Gladys'; SAM Restaurants, Inc. d/b/a Carolina's Diner; BW-SS Inc.; King Kullen Grocery Co.; PCA Too, LLC d/b/a Sugar Bakeshop; and The Coffee Bean LLC purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.

### 3.   Consumer Indirect Purchaser Plaintiffs

16.   Plaintiffs Evan Annis, Bradley Bennett, Mayelin Bernal, Amanda Boardman, Reynaldo Borge, Liana Britt, Michael Cervellino, Lisa Clemenson, Miranda Cofino, Cynthia Cornwell, Brooke Cutlip, Jarred Cutlip, Roy Derhammer, Matthew Edlin, Robert Frasher, Donald Friedman, Ernest Gambrell, Mikhael Gershzon, Raleigh Golden, Gina Gonzales, Nancy Goodman, Lauren Grouws, Debbie Hale, Richard Hammetter, Heidi Humphreys, Kristin Jangula, Bruce Johnson, Sandra Kluessendorf, Stacy Kurtz, John Luce, Samantha Macaluso, Laurie Marcello, Matthew Marek, Anthony Minicuci, Daynna

Mitchell, Erica Mitchell, Renee Newton, Francisco Olivares, Claudette Palakiko, Stephen Reeves, Mary Reilly, Kim Rybarczyk, Mary Salazar, Michael Santilli, Victor Sathler, Virginia Smith, Robert E. Sunsersi, Tammy Tacito, Bridget TenEyck, Thomas Tombarello, Sabra Turner, David Ulery, James Veneziano, and Claudine Williams indirectly purchased Granulated Sugar produced or sold by at least one of the Defendants for personal use and not for resale during the Class Period.

### B.    Defendants

#### 1.    Producer Defendants

##### a)    ASR/Domino Defendants

17.    Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. It is a global producer and seller of Granulated Sugar. ASR Group owns six sugar refineries in North America, including four in the United States: Yonkers, New York; Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California. ASR Group holds itself out as "the world's largest refiner and marketer of cane sugar with an annual production capacity of 6 million metric tons of sugar." It asserts that it sells its products to "customers in key channels, including grocery, industrial, foodservice and specialty." ASR Group is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire Fanjul Corp. ASR Group owns, as a subsidiary, Co-Defendant Domino. ASR Group is vertically integrated and owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

18.    Defendant ASR is a privately held Florida corporation and global producer and seller of Granulated Sugar based in West Palm Beach, Florida.

19.    Defendant Domino is ASR Group and ASR's marketing and sales subsidiary for Granulated Sugar, with a current principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida.

20.    Defendants ASR Group, ASR, and Domino are collectively referred to herein as "ASR/Domino."

21.    ASR/Domino markets most of its Granulated Sugar under the Domino® and C&H brand names but also sells sugar under the brand names Florida Crystals, Redpath, Tate & Lyle, Lyle's, and Sidul. It also sells sugar under various store brands.

### b)    United Sugar Defendants

22.    Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation ("United States Sugar"), which owns and operates a cane mill and cane refinery in Clewiston, Florida; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC, all of which grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming. United sells sugar under the United and Crystal Sugar brands, as well as the Imperial and Dixie Crystals brands, which were formerly Imperial brands before Imperial was acquired by United. It also sells sugar sold under various store brands.

23.    United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing

plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in Montana and Wyoming, as well as cane sugar in the Florida Everglades."

24.    United sells Granulated Sugar in bulk via truck and rail car. It also sells Granulated Sugar in various size packaging, including retail-size bags, 25-pound bags, 50-pound bags, and super sacks of 2,000 pounds.

25.    United approaches the market as a unified competitor, marketing and selling all the Granulated Sugar produced by its member owners. United handles locating customers, negotiating sales contracts, and arranging all logistics. United also sets the prices for all the products it markets and sells on its members' behalf.

26.    Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial" or "U.S. Sugar Savannah") is a Delaware company based in Georgia. On November 30, 2022, U.S. Sugar Savannah completed its acquisition of Imperial from Louis Dreyfus. U.S. Sugar Savannah is wholly owned by United States Sugar. U.S. Sugar Savannah holds the trademarks to "Imperial Sugar," and "Imperial Sugar" customers are directed by the "Imperial Sugar" website to contact U.S. Sugar Savannah for customer service.

27.    U.S. Sugar Savannah, which is wholly owned and controlled by U.S. Sugar, is a mere continuation of Imperial. Upon the purchase of Imperial Sugar Co. from Louis Dreyfus, all former Imperial Sugar employees continued as U.S. Sugar Savannah employees; all contractual obligations of Imperial were assumed; nothing changed ongoing execution of supply contracts with customers; and customer service representatives and

sales contacts remained the same. Payments were directed to the same bank account, with the name of the account changing to U.S. Sugar Savannah.

28.    Prior to its sale to U.S. Sugar Savannah and during the Class Period, Imperial's corporate offices were located in Sugar Land, Texas. Imperial produces Granulated Sugar in the United States. Imperial has a cane sugar refinery in Savannah, Georgia, and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky. Imperial sells Granulated Sugar in bulk via truck and rail car. It also sells Granulated Sugar in various size packaging, including retail-size bags, 25-pound bags, 50-pound bags, and super sacks of 2,000 pounds.

29.    Defendants United and Imperial are sometimes collectively referred to herein as United on or after November 30, 2022.

### c)    Louis Dreyfus

30.    Defendant Louis Dreyfus is a Delaware corporation with its principal place of business in Wilton, Connecticut. It is a worldwide leader in sugar trading and merchandising. In 2012, Louis Dreyfus acquired Imperial Sugar Company ("Imperial"). Imperial, with headquarters in Sugar Land, Texas, produces Granulated Sugar in the United States and independently markets and sells its Granulated Sugar products. Imperial has a cane sugar refinery in Savannah, Georgia, and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky. On November 30, 2022, Louis Dreyfus completed the sale of Imperial to U.S. Sugar Savannah.

31.    Louis Dreyfus and Imperial are sometimes collectively referred to herein as Louis Dreyfus on or before November 30, 2022.

### d)    Michigan Sugar

32.    Defendant Michigan Sugar is a Michigan corporation with its principal place of business at 122 Uptown Drive, Suite 300, Bay City, Michigan 48708. It is a cooperative consisting of nine hundred sugar beet owners and a global producer and seller of Granulated Sugar under the brand names Pioneer Sugar and Big Chief Sugar. It also sells Granulated Sugar sold under various store brands. Michigan Sugar owns and operates sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. It owns a production facility in Toledo, Ohio, and an agricultural research center in Bay County Michigan. It also has warehouse facilities in Michigan and Ohio.

33.    In 2020, Michigan Sugar closed its AmCane Sugar facility where it processed raw cane sugar into liquid sucrose, Granulated Sugar, and boiled brown sugar, among other items.

34.    Michigan Sugar sells Granulated Sugar in bulk and various sizes of packaging, including retail-size packages, 25-pound bags, 50-pounds bags, 100-pound bags, and super sacks of 2,000 to 2,500 pounds.

### 2.    Commodity Defendants

35.    Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058.

36.    Presently, Commodity appears defunct. During the Class Period, Commodity was a strawman entity and tool for Defendants to exchange competitive sensitive information and otherwise conspire. Commodity had no public presence. It did not maintain a website on the internet. It did not advertise its services to the public. It did not

publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, as alleged herein.

37.    Defendant Wistisen is the principal of Commodity who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary, and competitively sensitive non-public information between the Producer Defendants.

38.    Defendants Commodity and Wistisen are alter egos, and reference to one is a reference to both of them collectively.

39.    Throughout the Class Period, the Producer Defendants utilized Wistisen to facilitate the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information, regarding, among other things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy. Throughout the Class Period, the Producer Defendants utilized Wistisen to implement, monitor, and/or enforce the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information.

### 3.    Agents and Co-conspirators

40.    Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

41.    Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management,

direction, control, or transaction of the corporation's business or affairs.

42.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers, acquisitions, asset purchase agreements, or other business combinations.

## III.    JURISDICTION, VENUE, AND COMMERCE

43.    This action arises under Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

44.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

45.    Venue is proper in this District under 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

46.    During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

47.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, interstate railways, interstate highways, and the United States Mail, to effectuate their illegal scheme.

48.    Defendants' conduct also had a substantial effect on the intrastate commerce of each State in the United States and the District of Columbia.

13

49.    This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and each State and Territory of the United States and the District of Columbia.

## IV.    FACTUAL ALLEGATIONS

### A.    The Market for Granulated Sugar in the United States

50.    The U.S. sugar production process starts from beet and cane fields. About 56% of the sugar production is beet sugar and 44% is cane sugar.   After processing, beet sugar and cane sugar are reasonably interchangeable.

51.    "Granulated Sugar," also known as "white," or "table" sugar, is made by extracting juice from the sugar cane or sugar beet, processing the juice to remove impurities and to concentrate it into a thick syrup, boiling it until sugar crystals form, separating the sugar crystals from the syrup in a centrifuge, drying the sugar crystals with hot air, and grinding them to uniform size.[4]

52.    Granulated Sugar is considered the gold standard of sweeteners with a clean, pleasant sweetness and no secondary taste or aftertaste. Granulated Sugar is the most common sweetener used in home food preparation and cookbooks and consumers tend to

---

[4] "Refined Sugar" as that term is used herein, refers to sugar that is extracted from sugar cane or sugar beets and processed to yield food grade sugar.  Granulated Sugar is one form of Refined Sugar, along with brown sugar, powdered sugar, and liquid sugar.

dislike any sugar substitute that does not match its sweetness profile. Eighty percent of all sugar sold in the United States is Granulated Sugar.

53.     The sugar processing industry had an estimated revenue of $13.5 billion in 2024.

54.     Defendants, either directly or via their marketing affiliates, market and sell Granulated Sugar to customers, including food and beverage manufacturers, retailers, and food service companies. Defendants also sell Granulated Sugar to distributors who resell or further refine it into various other types of sugar products.

55.     Granulated Sugar is a staple food commonly used by commercial, industrial, and institutional users such as bakeries, restaurants, confectionaries, and food manufacturers, as well as consumers as an ingredient in baking, cooking, and sweetening foods and drinks. Commercial, industrial, and institutional users (i.e., the proposed class of Commercial Indirect Purchasers) purchase the Producer Defendants' Granulated Sugar through direct purchaser intermediaries such as wholesalers or food service distributors, (i.e., the proposed class of Direct Purchasers), which purchase Granulated Sugar directly from the Defendants. Consumer Indirect Purchasers generally purchase such sugar at retail for end use.

56.     Granulated Sugar, regardless of whether it is made from sugar cane or sugar beets, is a commodity product with little or no differentiation based on the producer. Typically, competition for commodity products is based on price as opposed to other attributes such as product quality or customer service; as a result, a commodity such as Granulated Sugar is susceptible to cartel behavior.

57.    Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer affect the market price for Granulated Sugar.

### B.    The Defendants Have Market Power

58.    During the Class Period, the Producer Defendants collectively controlled 70% to 75% of the market for Granulated Sugar in the United States ("Relevant Market"). The Producer Defendants recognize their dominant position. For instance, in an email string discussing Imperial's acquisition by United, ASR/Domino noted the view that there is "1 less competitor and now 3 companies account for 75% of the market."[5]

59.    The 2024 estimated market share of each Producer Defendant by capacity is shown in Figure 1 below:

---

[5] Attachment to Motion for Protective Order by American Sugar Refining, Inc. [Redacted], Email from ASR/Domino's Adam Whittaker dated 3/25/21, *United States v. U.S. Sugar Corp. et al.*, No. 21-cv-1644-MN (D. Del. April 18, 2022), ECF No. 207-24, at 2.

| Marketing Entity | Refining Entity | Capacity (cwt) | % Share |
|---|---|---|---|
| Domino Foods, Inc. | American Sugar Refining, Inc. | | |
| | Chalmette, LA | 20,500,000 | |
| | Baltimore, MD | 16,500,000 | |
| | Crockett. CA | 17,000,000 | |
| | Yonkers, NY | 12,250,000 | |
| | Florida Crystals Corp. - South Bay, FL | 6,600,000 | |
| | Total | 72,850,000 | 30% |
| United Sugar Cooperative | American Crystal Sugar Co. | 40,000,000 | |
| | U.S. Sugar Corp. – Clewiston, FL | 18,000,000 | |
| | U.S. Sugar Savannah Refinery - Savannah, GA | 18,600,000 | |
| | Minn-Dak Farmers Co-op – Wahpeton, ND | 9,600,000 | |
| | Wyoming Sugar Co. - Worland, WY | 1,100,000 | |
| | Total | 87,300,000 | 36% |
| National Sugar Marketing LLC | Amalgamated Sugar Co. | | |
| | Snake River Sugar Co. | 23,500,000 | |
| | Southern Minnesota Beet Sugar Cooperative | | |
| | Renville, MN | 10,100,000 | |
| | Brawley, CA | 3,350,000 | |
| | Total | 36,950,000 | 15% |
| Cargill, Inc. | Louisiana Sugar Refining LLC - Gramercy, LA | 20,000,000 | 8% |
| Michigan Sugar Co. | Michigan Sugar Co. | 14,500,000 | 6% |
| Western Sugar Cooperative | Western Sugar Cooperative | 12,000,000 | 5% |
| Grand Total | | 243,600,000 | |

Figure 1.

60.     The total market share of the Producer Defendants is approximately 72%.

61.     The domestic market for Granulated Sugar has gone through significant consolidation in recent years, helping to facilitate cartel conduct. For instance, in 2019, United sought to acquire competitor Imperial Sugar from Louis Dreyfus. Subsequently, United States Sugar, one of the four member-owners of United, entered into an asset purchase agreement whereby U.S. Sugar Savannah would acquire Imperial, and United would market and sell all of the Granulated Sugar produced by Imperial.

62.     In 2021, the U.S. Department of Justice ("DOJ") sued to block the proposed merger, arguing that the acquisition would leave the overwhelming majority of sales across the Southeast in the hands of only two producers and would create higher prices for businesses and consumers in the Southeastern United States.  The district court was not

17

persuaded by the DOJ's limitation of the relevant geographic market to the Southeast. The merger was finalized on November 30, 2021.

**C. Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States.**

**1. Defendants Unlawfully Shared Confidential Price and Sales Information With Each Other.**

"Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . . ."

—*American Column & Lumber Co. v. United States*,
<u>257 U.S. 377, 410</u> (1921)

63.    Defendants engaged in a systematic and deliberate scheme to exchange competitively sensitive, non-public information to suppress competition and maintain artificially high prices for Granulated Sugar in the United States. Through a network of coordinated exchanges facilitated primarily by Commodity, the Producer Defendants— United, Michigan Sugar, Louis Dreyfus, Imperial, and ASR/Domino—shared and received current pricing, sold positions, crop size and yields, and forward-looking price strategies. These exchanges were neither anonymized nor publicly accessible, serving only the agreed conspiratorial purposes of the Producer Defendants. There is no economically rational reason for the Producer Defendants to share such information in the absence of an agreement.

64.    This information was shared for the purpose of enabling Defendants to effectuate their agreement to artificially affect prices and avoid competing with one another. The information sharing scheme is a plus factor that supports the existence of a *per se* unlawful conspiracy to raise, fix, maintain, and/or stabilize prices of Granulated

Sugar during the Class Period.

65.     Additionally, Defendants' information sharing scheme is, in and of itself, an independent violation of Section 1 of the Sherman Act, analyzed under the Rule of Reason.

66.     ***Mechanism of Information Exchange.*** Commodity acted as a clearinghouse, collecting detailed, sensitive non-public information from the Producer Defendants, and rapidly redistributing it by agreement to other Producer Defendants within the cartel. The information exchanged allowed the Defendants to avoid price competition and coordinate their pricing strategies in real-time. For example, sold positions provided critical insights into each competitor's pricing flexibility. By knowing when a rival was nearing full capacity, the Producer Defendants could confidently raise prices without fear of being undercut by their ostensible rivals.

67.     The role of Commodity in facilitating this scheme was crucial. It was a conduit for, and tool of, the Producer Defendants.  Unlike legitimate industry analysts, Commodity lacked a public presence, did not market its services to the public, and did not publish anonymized market research based on the data it received. This exclusive and secretive arrangement underscored the Producer Defendants' intent to limit access to critical market information and maintain their price-fixing conspiracy.

68.     Commodity did not gather information through voluntary surveys or periodic polling that it anonymized. Instead, the Producer Defendants regularly shared contemporaneous competitively sensitive, non-public information about their pricing and sold positions with Commodity, and Commodity in turn contemporaneously shared that competitively sensitive information with the other Producer Defendants.

19

69.     Commodity does not make its reports available to purchasers of Granulated Sugar and others in the sugar supply chain, thereby strengthening the advantage that the Producer Defendants gain by sharing information only with one another as producers.

70.     Commodity does not anonymize the competitively sensitive information it receives from the Producer Defendants when passing such information on. Furthermore, Commodity does not share or offer to share this competitively sensitive information with the customers of the Producer Defendants, nor does it publicly publish the competitively sensitive information it obtains from and shares with the Producer Defendants or otherwise make it available to consumers.

71.     The Producer Defendants understand the competitive sensitivity of the information that they provide to Commodity. Commodity understands that the competitively sensitive information that the Producer Defendants share would not ordinarily or rationally be disclosed to competitors in a competitive market. The purpose of their information sharing was to enable United, Michigan Sugar, Louis Dreyfus, and ASR/Domino to raise, fix, maintain, stabilize, or coordinate prices of Granulated Sugar in the United States.

72.     ***Effect on the Market.*** The consequences of the Defendants' coordinated efforts were profound. By maintaining a shared understanding of one another's pricing and market strategies, the Producer Defendants effectively eliminated meaningful competition. The United States Department of Agriculture's ("USDA") restrictive production allotments and import limitations further amplified the anticompetitive effects, as Defendants could manipulate supply to exploit limited market alternatives. Retail sugar

prices rose significantly during the Class Period, with no corresponding increase in production costs or supply constraints.

73.    Due to the USDA's production allotments linked to USDA loan programs and limitations on imports and tariffs, the Producer Defendants know that as they sell out of Granulated Sugar, they can charge higher prices because there will be little to no additional competitive product from foreign sources available in the domestic market that could force them to reduce price. Thus, knowing one another's sold position allows them to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the amount of supply.

74.    The information exchange was in real-time.  Commodity provided this reciprocal information to the Producer Defendants rapidly, often within hours of having received it. The Producer Defendants then used the market intelligence they received from Commodity and other sources when deciding how much to charge for Granulated Sugar, enabling them to  extract supra-competitive prices, which they did from the Plaintiffs.

75.    Using the non-anonymized competitively sensitive, non-public information exchanged contemporaneously through Commodity, the Producer Defendants ensured that they would not undercut each other's prices and cause prices to decrease as they would in a competitive market. The Producer Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and sold positions only because Commodity collected this competitively sensitive information from each of them and shared it with the other, pursuant to their unlawful agreement.

76.    The Sourcing Business Leader for the Meals and Baking Operation System

at General Mills explained that as a large customer of sugar it would negatively affect General Mills if sugar suppliers were sharing their sold information with one another.

77.    In particular, General Mills believes that "if [sugar suppliers] knew what other [suppliers] were potentially going to offer, how much they would offer or how aggressive someone else would be, [it] could potentially dictate what type [of] pricing they would submit to us."

78.    United does not publish the company's current Granulated Sugar prices or its sold position. United's sold position was confidential, and its employees were not supposed to share that information. Nevertheless, United did intentionally and regularly share its sold position with Mr. Wistisen, who United knew would in turn share it with ASR/Domino and other competitors.

79.    Dirk Francis Swart, executive vice-president of sales at United States Sugar, testified that United Sugar shared information with Mr. Wistisen because United **"know[s] he's going to share information and we want the information that gets shared to be accurate."**

80.    ASR/Domino has a written code of conduct with an ethics policy that prevents any ASR/Domino employee from directly talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Mr. Wistisen knowing that he would provide the information to other competitors.

81.    The unlawful agreement to fix prices was implemented through information

exchanged through Commodity, which included current pricing, future or forward pricing, pricing strategies, and sold positions. The conspiracy also included price signaling among Defendants, and upon information and belief, communications made through other conduits including persons and/or software platforms.

82.    Furthermore, as market leaders, the Producer Defendants account for the supermajority of Granulated Sugar production, sales, and capacity. As a result, smaller market participants are not an effective competitive constraint on Producer Defendants' dominance.

83.    ***Evidence of Coordinated Conduct.***  The conspiratorial exchanges between the Defendants were neither incidental nor benign. For example, on multiple occasions, senior executives at Producer Defendants explicitly sought to signal pricing intentions to their competitors. Internal communications reveal efforts to share updates on market "tightness," forward-looking price increases, and inventory conditions through Commodity, ensuring alignment among the Producer Defendants. These exchanges were instrumental in setting supra-competitive prices.

84.    The exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

85.    The Producer Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Mr. Wistisen of Commodity pursuant to their anticompetitive agreement as alleged below, in order to raise,

fix, maintain, or stabilize Granulated Sugar prices.

86.    In connection with the United/Imperial merger investigation, direct evidence of conspiratorial communications sharing competitively sensitive information was made public.  Excerpts of inculpatory communications follow:

87.    As an example, a September 16, 2019 email communication to Mr. Wistisen from ASR/Domino's Vice President of Industrial Sales, Alan Henderson, disclosed ASR/Domino's 2020 pricing and sold positions. Mr. Wistisen asked Mr. Henderson, "Wondering where you would put refined prices and coverage?" Mr. Henderson responded "Pricing for FY20: Northeast - $38.50 bulk basis Gulf - $36.50 bulk basis West - $39.00 bulk basis Cane refiners should be close to 70 to 75% covered for FY20. The open business that does remain will be at higher prices."

88.    ASR/Domino disclosed this confidential information knowing it would be shared with its competitors, and in return, that it would get its competitors' confidential information. Mr. Wistisen responded that he would send crop and pricing updates in the next day or two, and noted, "The price updates I did receive today didn't have nearly the level of cane price increases you reported . . . but I bet they're headed that way[.]"

89.    Commodity was not the only conduit of information between the Producer Defendants during this time period. On November 15, 2019, Gerald Kramer of Kramer Brokerage Co. shared Domino price quotes with multiple Louis Dreyfus managers, and inventory details, writing: "[a]lso told that Domino still has sugar to sell." In response, Jim Evans, National Sales Manager at Louis Dreyfus, expressed his appreciation: "This is very helpful!" Jeana Hines, Vice President of Sales & Marketing at Imperial, in the same email

chain, asked Gerald Kramer, "Have you heard anything on what Domino is doing with pricing for their grocery retail business?" Kramer responded, "Domino will not sell any 50# EFG below $24.00/50# fob[6] refinery thru 2020 for end users and only thru 12/31/19 for distributors. If I get any info on retail business I will pass it on."

90.    On January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed Mr. Henderson that "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

91.    On March 3, 2020, Mr. Henderson sent an email regarding "Colloquium Recap" to Mr. Sproull, which contains a "summary of points from the International Sweetener Colloquium," including "Competitive Numbers" for fiscal year 2021 for certain competitors, including "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston - $37.50 FOB bulk," "NSM – still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial — 38.00/38.50 for CY 2021 on bulk EFG."

92.    The Producer Defendants provided accurate information to each other through Mr. Wistisen. ASR/Domino was typically "upfront" with the information it

---

[6] "FOB" or "fob" is an abbreviation for Free on Board. Free on Board is an industry term of art that means the buyer takes the goods free of freight charges at the seller's location; in other words, any transportation related costs are not included.

provided to Mr. Wistisen. In one example of such "upfront" information, Mr. Henderson

disclosed to Mr. Wistisen in an August 2020 email pricing updates for ASR/Domino's

Granulated Sugar. On August 17, 2020, Mr. Wistisen wrote to Mr. Henderson, providing

him with sugar market updates and asked: "Where would you put cane prices and

coverage?" The next day, August 18, Mr. Henderson responded:

> [...]
> Quick Update:
> Pricing:
> Northeast - $39.00 to $40.00 BULK FOB
> South - $37.50 to $37.75 Bulk FOB - fighting Cargill mainly
> West - $39.50 to $40.00 Bulk FOB - values staying strong…
>> Cane gulf still fighting for share - but some talk of Cargill moving
>> prices up to $37.50 gross fob.
> Coverage:
> Beets - 70 to 75%
> Cane - 50 to 55%
> [...]

93.     Moreover, Mr. Wistisen told both United and ASR/Domino that he spoke

with Michigan Sugar and other sellers, and that the information he provided came directly

from them. For example, Mr. Wistisen wrote to United that "ASR saying back up to $40.50

to $41," on one occasion, and on another, he wrote to Mr. Henderson that "the United

[pricing and sold position] info I provided was direct from them this morning. They held a

big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were

the result." When discussing pricing, he stated that he did not have Michigan pricing yet,

and "I hope to talk with them [Michigan] on Fri./Mon."

94.     Similarly, Mr. Wistisen shared Michigan Sugar's pricing and sold positions

with United and ASR/Domino. In August 2020, he reported to Mr. Henderson at

ASR/Domino, "My goodness, what a difference a month makes. Michigan 85+% booked[.]" The next month, Mr. Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." He added with regard to pricing that Michigan was at "$38.5+, selective selling."

95.    Mr. Wistisen rapidly provided information on pricing and sold position to the Producer Defendants, often soon after having received it. On September 21, 2020, Mr. Wistisen separately asked, within minutes, Mr. Henderson and Eric Speece, a Director of Strategic Accounts at United, if there was "[a]nything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Mr. Speece shared, "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Commodity thanked United "for keeping the communication lines open!"

96.    On September 22, 2020, Mr. Henderson responded:

Pricing (Cane)

North and mid-Atlantic - $40.50 to 41.00 FOB - prices were lower past few weeks but have firmed up to these levels.  No discounting at this time.

Gulf - $38.50 fob

West - $40.50 to $41.00 fob firm

Note - higher levels for the Oct./Dec. 20 period as most cane and beet companies are well sold and/or filling past force majeure volume.

I'm hearing most cane guys 70 to 75% booked with the exception of Cargill at 90%??

Beet prices below seem accurate and coverage at 90% I believe is about right.

97.    On September 22, 2020, *less than three hours* after receiving Mr.

Henderson's response, Mr. Wistisen provided United and ASR/Domino with the information from each other in emails less than a minute apart. Mr. Wistisen told ASR/Domino that "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month. Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at the low price, industry coverage 87%, all but NSM over 90+% booked." To United, Mr. Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below that, and the other southern refiners up 10-15% from the average. . . . Waiting for confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

98.     In yet another example, Mr. Wistisen emailed both Mr. Speece at United and Mr. Henderson at ASR/Domino within approximately 40 minutes of each other in mid-November 2020 asking, "where would [they] put . . . prices?" Both responded later that day with pricing information.

99.     On November 16, 2020, Mr. Wistisen wrote to Henderson at ASR/Domino, asking: "Curious what you're hearing on domestic raw and refined pricing? I haven't heard back from United yet. Did they pullback from spot market? Where would you put prices and cane coverage?"



100.    Mr. Wistisen received a response from Mr. Henderson on ASR Pricing and inventory later that day: "Prices have firmed up again based on higher # 16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations.  For calendar 2021: East/West - $42.00 fob[;] Gulf -$39.50 fob [;] Cane Coverage - 85-90%[.]" On November 17, 2020, after receiving a response from United, Mr. Wistisen responded to Mr. Henderson: "So strange, I can't wrap my head around United's approach. They came up very short on production, and market has firmed, but they're still at $36.50 RRV and $38.50 Southeast?!?! But did say they'll probably be taking prices higher given strong sold position . . . Waiting to hear back from a number of contacts."  Mr. Wistisen also communicated the ASR pricing and inventory information to United on November 17.

101.    On January 19, 2021, Mr. Wistisen wrote to United, delivering several paragraphs of information on developments in the sugar industry. Near the end, he asked:

"Has United put out a price range on FY22?" On January 20, Mr. Speece at United responded: "We have not yet set pricing for 2022, but we will soon."

102.    Mr. Wistisen later emailed Domino/ASR asking for "[a]ny guidance [ASR/Domino] could give on how sub-30 cent No 16 prices makes sense?" Mr. Henderson at ASR/Domino and Mr. Wistisen exchanged messages regarding the "reason" Mr. Henderson had "heard," and Mr. Wistisen responded with real-time information from competitor United, "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22. Selling FY21 firm, good activity, little to no competition from NSM or Western." Mr. Henderson passed this along to Adam Whittaker at ASR/Domino, adding, "United is usually pretty upfront with [Wistisen]." Whittaker replied "Good timing. Just off the phone with Ron…United telling him they're at $36.50 for 2022 but very little activity for now [...] Ron also asking about raw prices [...]" Upon information and belief, Ron refers to Ron Sterk from Sosland Publishing, the publisher of the Sosland Sweetener Report.

103.    On February 15, 2021, Mr. Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/refiners, I'll send along indications." Mr. Speece quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Mr. Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder

FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

104.    The next day, February 17, 2021, Mr. Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50[.]"

105.    On March 25, 2021, in response to the news that "Imperial's sugar will be marketed by United," Adam Whittaker, Director at Domino Foods, remarked that, "It's going to be more important than ever to stay close to United. To the point where we might want to start thinking about ways to work with them (*i.e.*, asking them for quotes [REDACTED]), on down the road. This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry . . . ."

106.    On April 29, 2021, Mr. Wistisen wrote to Mr. Henderson: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts," and provided pricing information. In response to the inquiry, Henderson confirmed the accuracy of Wistisen's information: "I believe your pricing numbers below are very accurate," and provided additional pricing details: "Prices in FY21 are very firm with both coast at $43.50/$44.00 bulk FOB basis. We heard RRV folks are tight and holding at $36.50 fob. For FY22, RRV at $35.50 big volume, $36.00 smaller volume fob. For us, closer to $39.00 gulf, $38.50 Florida and $41.50 both coasts. Close to 30% coverage for FY22."

107.    On May 11, 2021, Mr. Wistisen wrote to ASR/Domino: "Are those higher

spot prices, $43.50-44.00 holding up?" On May 12, 2021, Mr. Henderson responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at $44.00 fob bulk basis. The $31.50 #16 is also pushing white pricing up."

108.    On May 17, 2021, Wistisen emailed Henderson, requesting pricing and inventory information: "Have you bumped up FY22 prices yet on explosive gains in No. 16 prices… Where would you put refiner FY22 coverage?"

109.    Later that same day, Henderson responded with ASR/Domino FY21 pricing: "FY21 prices – now at $45.00 fob bulk basis east and west coast. Down in Florida and gulf $44.00 fob bulk basis. FY22 prices – $42.00 fob bulk basis, $40.50 fob bulk basis Florida and the gulf. FY22 coverage – approximately 35 to 40%."

110.    On May 18, 2021, Mr. Wistisen wrote again to ASR/Domino: "Just talked with United: prices unchanged, spot and forward Hello!? But their head honcho is on vacation, bad timing Only about 40% covered. But expect big action over the next month, 20+% add to bookings, and at that time expect to raise prices, and not by just a dollar...Western limping along, NSM picking off business...They're still $36 spot and forward, 45-50% booked. NSM: ...I believe they're $36 Renville and $38 west, 45-55?% booked."

111.    On May 26, 2021, Henderson circulated an internal email, relaying pricing information from his conversation with Wistisen: "Not surprised at the $37.75 fob rail for Cargill. In talking with Jenkins and Rich Wistisen they believe Cargill is offering $2.00 above RRV beets for FY22. United - 35.75 fob RRV for many decent size accounts. Cargill

- 37.75 fob Gramercy for good rail volume."

112.    On June 17, 2021, Mr. Wistisen emailed Mr. Henderson an update on crops and asked, "What are you seeing on the price and demand side of things?" Mr. Wistisen then explained:

I'm just getting going on pricing, but have heard a bit:

NSM: 35-36 net RRV, 37 net West. Claiming to be close to sold out at Brawley, 70% Renville, but only 40% booked Amalgamated.

United reportedly (I'll talk with them tomorrow) holding $36.50 gross, bigs are booking and getting discounts of about a buck or less, that's less than last season.
Western supposedly (I'll talk with them tomorrow) increased prices to $36.50 net, not getting many takers.

No talk on Michigan, yet. I hope to talk with them Fri/Mon.

Cane: I'm hearing Cargill is really chasing prices lower, a few deals under $37gross.
And that Southeast has slipped below $38?

But that ASR is holding firm on the coasts.

113.    The next day, Mr. Henderson responded:

[w]ord on the street [was] United moving up a $1.00 cwt since bookings now over 60%." He went on to share future prices for the 4th quarter of 2021:

"Cane prices firming up as #16 values rise.

Oct.- Dec. 21

East/West coasts ·- $44.00 gross fob bulk basis

Gulf - $42.00 gross fob bulk basis

Jan.- Dec. 22

East/West - $42.00 gross bulk basis

Gulf - $39. 75 gross fob bulk basis.

114. On July 12, 2021, Mr. Wistisen reported to Henderson new pricing and inventory details: "Michigan and Western 80+% [booked], and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon). Hearing NSM still a bit aggressive, at least into Texas." In the same email, Mr. Wistisen asked, "What's happening on the cane side of the fence? Sounds like you're now $48 spot, and Imperial $49. Where would you put forward pricing and coverage?"

115. That same day, Mr. Henderson responded by updating Mr. Wistisen on ASR/Domino's pricing details: "Our pricing for remainder of FY21 is $48.00 bulk basis all locations. With raws remaining high in the Oct./Dec. 21 period we are $46.00 fob bulk basis east/west and $44.00 gulf. For FY22 close to 65% booked and moving prices up. I haven't officially seen a United price increase but heard it's out there (+$2.00)." Additionally, on the same day, Henderson forwarded Wistisen's message to coworkers, saying, "FYI below………United price increase. Rich is thinking $2.00 increase but no official word yet. Let's see if we can hunt something down."

116. On July 16, 2021, Mr. Wistisen wrote to ASR/Domino: "I don't understand it, but this is the word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm… Any changes in ASR forward prices? I have you at $39.75 gulf and $42 coasts." Later, Mr. Wistisen adds: "Well at least one group, your group, has their finger on the pulse of this market. The United info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result."

117. Also on July 16, 2021, Henderson updated Wistisen on ASR's pricing: "We

are now $40.50 gulf, $43.00 fob east and west coast."

    **2.**    **Defendants Relied Upon the Exchanged Competitively Sensitive Information.**

118.    The Producer Defendants used the sensitive information they exchanged through Mr. Wistisen in furtherance of their anticompetitive agreement and used it to send messages to competitors about desired price levels. For example, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded pricing information from Mr. Wistisen to others at ASR/Domino with a recommendation of what price ASR/Domino would have to offer to win a specific customer's business. In another example, United's Mr. Speece thought a competitor was selling at too low a price, so he told his colleagues that United "may want to communicate pricing earlier than the colloquium to send a msg [message]." Knowing a competitor's sold position was used to justify higher prices.

119.    ASR/Domino's Mr. Henderson frequently forwarded the information obtained about other competitors from Mr. Wistisen to his sales team and his superior. In one such example, Mr. Henderson received, and forwarded to his subordinates, information from Mr. Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar." In another example, Mr. Henderson sent to his boss, Mr. Sproull, information on competitors' inventory positions that he received from Mr. Wistisen.

120.    United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal competitors. In one example, United's Executive Vice President, Dirk

Swart, told United's Mr. Speece that he wanted Mr. Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold position. They discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone.

121.    United's Mr. Swart believes that the "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices.

* * *

122.    There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity and/or other means to secretly share highly confidential and proprietary detailed information about their current and future prices and sold positions. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret.  Accordingly, sharing such proprietary competitively sensitive information would not be in Defendants' economic self-interest in the absence of an agreement.

123.    Defendants knew and intended that their private exchanges of competitively sensitive information about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Granulated Sugar prices above the levels that would have existed absent the anticompetitive conduct alleged herein.

124.    The Producer Defendants are interested in achieving higher prices for Granulated Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's

CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

125.    In fact, in a March 2019 internal presentation, United explained that it launched a new "Competitive Sourcing Project" in 2019 to, among other things, "[o]btain real-time market data on which competitors are supplying the lanes / customers (by geography)".

126.    ASR/Domino similarly anticipated competitive reactions, used pricing to send signals to competitors, and considered how its actions may cause market prices to decline.

127.    ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

128.    ASR/Domino also observed that the proposed acquisition of Imperial by a member of the United cooperative was a "good thing" for ASR/Domino because it would help to align United's pricing strategy with ASR/Domino's. ASR/Domino believed that after the acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry."

129.    Michigan Sugar likewise participated in the sharing of sensitive information regarding pricing and sold positions with the intention of artificially raising, fixing, maintaining, or stabilizing Granulated Sugar prices above the price that would have

prevailed in a competitive market.

### 3.    Defendants Agreed to a Common Formula to Fix Prices.

130.    In furtherance of their agreement to manipulate and fix the prices of Granulated Sugar, the Producer Defendants developed and agreed to standardized pricing formulas. For example, one of their formulas relied on publicly observed benchmarks, such as futures prices, to coordinate their pricing strategies and maintain artificially high price levels. This approach allowed Defendants to obscure their collusion under the guise of market-driven practices while avoiding competitive pressures.

131.    The Producer Defendants routinely referenced Number 16 spot prices to set their FOB pricing. For example, in February of 2021, Wistisen told Henderson that on the pricing side, sugar prices could increase thanks, *inter alia*, to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices…." This communication highlights how shared adherence to such benchmarks reinforced collusion rather than competition.

132.    Similarly, in July 2021, Henderson referenced United's impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and do the math." Henderson later acknowledged that ASR/Domino was actively "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match ASR's price of $40.50. United's executives admitted that this increase followed a "big huddle" among their marketing team, a clear signal of coordinated decision-making.

133.    Even as Imperial Sugar operated outside the domestic production framework before its acquisition by United, it relied on similar pricing formulas tied to Number 16

prices. Notably, Imperial declared that "acting as a price-taker would put the whole business at risk," reinforcing its disinterest in genuine price competition. Such statements reveal a collective industry mindset aimed at maintaining profit margins through coordinated pricing rather than market-based competition.

134.    The Producer Defendants' reliance on shared pricing formulas constitutes a *per se* violation of the Sherman Act. The DOJ, in an amicus brief filed in *Gibson v. Cendyn Grp., LLC*, affirmed that any "formula underlying price policies," whether or not executed uniformly, qualifies as unlawful concerted action.  The DOJ stated:

> In particular—and especially important here—the *per se* prohibition on price fixing applies with full force to concerted action by competitors on any "formula underlying price policies." [*United States v.*] *Socony-Vacuum* [*Oil Co.*], 310 U.S. [150] at 222, 226 n.59 [(1940)]); *see also id.* at 223 ("an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone"). That includes any formula used to fix benchmark, component, recommended, or "starting point" prices—even if end prices ultimately vary… *see also, e.g.*, …*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 771 (2d Cir. 2016) ("benchmark" or "component" used in contracts setting interest rates).
>
> Moreover, black-letter antitrust law prohibits horizontal price-fixing agreements without regard to whether the agreement is carried out at all. The agreement itself is the violation.

Amicus Brief dated Oct. 24, 2024, at 24-25, *Gibson v. Cendyn Grp.*, *LLC*, No. 24-cv-03576 (9th Cir.) (ECF No. 28.1).  Courts have consistently recognized that collusive reliance on

formulas to set prices distorts free-market dynamics and undermines competition.[7]

135.    By agreeing to common pricing formulas based on Number 16 spot prices, the Producer Defendants created an environment where price-fixing was not only feasible but virtually guaranteed. This deliberate coordination eliminated the unpredictability inherent in competitive markets, ensuring stable yet inflated prices that directly harmed competition generally and consumers specifically. Such conduct underscores a blatant disregard for antitrust principles, further illustrating the Defendants' conspiratorial objectives that amount to a *per se* violation of the Sherman Act.

### 4.    Sugar Prices Increased in Parallel During the Class Period and by More Than a Competitive Market Would Allow.

136.    Granulated Sugar prices increased significantly during the Class Period as a result of Defendants' conduct. As shown in Figure 2 below, nominal retail prices of Granulated Sugar rose 69% from January 2019 through October 2024:

---

[7] *See* OECD, *Roundtable on Information Exchanges Between Competitors* – Note by the Delegation of the United States (2010), available at https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.



Figure 2.

137.    This increase was contrary to pricing patterns prior to the Class Period and is not explained by market forces, such as inflation (CPI)[8], as shown in Figure 3 below:

---

[8] Consumer Price Index ("CPI") is a price index of a basket of goods and services paid by urban consumers. Percent changes in the price index measure the inflation rate between any two time periods. CPI is a commonly recognized measure of inflation in the United States.



Figure 3.

138.    Moreover, Granulated Sugar prices increased dramatically during the Class Period without a decline in the supply of Granulated Sugar. U.S. beet and cane sugar production increased from 8,999,000 short tons in 2018/2019 to an estimated 9,368,000 short tons in 2023/2024.

139.    In the past 20 years, the price of Granulated Sugar has doubled on an indexed basis. There is no economic rationale for the rate of price increases during the Class Period.

140.    Defendants relied upon Mr. Wistisen at least as early as the first half of 2019 to enable it to fix or coordinate prices with the other Producer Defendants. Cane sugar prices are now at their highest level since November of 1974. Commencing on or about October of 2019, prices experienced one of the steepest climbs ever, which is ongoing.

42

During that period, the Producer Price Index ("PPI") calculated by the Federal Reserve Bank of St. Louis went from 87.6 to 97.4. After United's acquisition of Imperial in 2023, prices further increased, going from a PPI of 110.6 to 123.2 by the end of 2023.

141.    Given that Defendants control more than 70% of the market, it is not surprising that Defendants increased the retail prices for Granulated Sugar by the same or nearly the same dramatic amount over the Class Period.

142.    The temporal proximity of the price increases to meetings of the executives of Defendants is further evidence of their illicit understanding. Many of the price increases at issue in this market occurred after International Sweetener Colloquium ("ISC") meetings, when participants had an opportunity to coordinate with one another. The ISC provided a perfect opportunity for such collusion.

143.    In negotiating sales of sugar, sugar producers start with a price for bulk Granulated Sugar f.o.b. the refinery, which means that the purchaser takes possession of the sugar at the refinery. As most purchasers have sugar delivered, the negotiated price will add on the cost of freight to the f.o.b price. The negotiated price may also include upcharges for packaging or converting Granulated Sugar into other forms of sugar.

144.    The initial quoted price may be provided as a dollar amount per CWT which is the hundredweight price. Other times prices are quoted per pound. If the quoted price is $50 f.o.b. CWT that is equivalent to $0.50 a pound f.o.b.

145.    In January 2019, beet processors announced that they would hold prices firm in the Midwest at $0.35 per pound f.o.b.—up from opening offers of $0.34 a year earlier.

146.    As reported in April 2019, soon after the ISC meeting held that year, buyers

who had paid beet sugar prices in the low 30 cents extending back to 2017 were shocked at a $0.02 to $0.03 per pound increase. ASR/Domino had similarly increased prices to $0.37 per pound f.o.b. from its Northeast refineries from the $0.35-$0.36 it had charged the previous year.

147.    By November 2019, ASR/Domino was offering its sugar on the spot market at $0.44 per pound f.o.b. from all its refineries.

148.    In December 2019, early offers for beet sugar contracts for the 2020-21 season were between $0.36 and $0.38 per pound f.o.b. from the Midwest.

149.    By February 2020, as the contract season began in earnest, Michigan Sugar offered its beet sugar for $0.385 per pound f.o.b. while ASR/Domino offered refined cane sugar for $0.41 per pound f.o.b. from all its refineries.

150.    Defendants' communications with Wistisen further evidenced their parallel pricing. For example, Defendants held similar prices "firm" in parallel, which is another way of saying they would not be discounting to take market share. For instance, on September 21, 2020, United was "**firm** at $36.50 (no change) and now $38.50 on cane." (Emphasis added).

151.    In 2020, spot prices for cane sugar reached seven-year highs in some instances and in the fourth quarter of 2020, they exceeded the high spot prices for 2019-2020.

152.    On February 17, 2021, Mr. Wistisen conveyed the following to Mr. Henderson at ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to **hold steady** at $36.50 and $38.50 . . . ." (Emphasis

added).

153.    Nonetheless, in addition to holding prices firm in parallel, Defendants increased their prices in parallel. For example, although United initially communicated it was holding prices firmly at $36.50 and $38.50, it also conveyed its plan to increase prices when the time came. On May 18, 2021, Mr. Wistisen told Mr. Henderson that he had just talked with United, and to "expect big action over the next month, … and at that time expect to raise prices, and not by just a dollar …." For the 2021-22 contract season, Michigan Sugar started its offers at $0.38 per pound f.o.b. increasing to $0.39 in June 2021. Also in June 2021, ASR/Domino offered its refined cane sugar for $0.42 per pound f.o.b. from its Northeast and West Coast refineries.

154.    In early August 2021, ASR/Domino increased the price for sugar in the 2021-22 contract period to $0.44 from its Northeast and West Coast refineries. By late August, Michigan Sugar was at $0.41 per pound for the 2021-22 contracts and ASR/Domino increased its prices to $0.45 f.o.b. from its Northeast and West Coast refineries.

155.    A few weeks later, ASR/Domino raised its prices to $0.51 per pound f.o.b. for all refineries for delivery from October through December 2021 and to $0.47 per pound from its Northeast and West Coast refineries beginning in January 2022.

156.    In October 2021, ASR/Domino raised its price for the rest of 2021 to $0.55 per pound f.o.b. from all its refineries and $0.48 per pound from its Northeast and West Coast refineries and $0.46 cents from its Gulf and Southeast refineries beginning in January 2022.

157.    Soon after the 2022 ISC ended, prices rose by 25% in many instances from

the prices for which sugar was contracted for in 2022-23.

158.    For the 2023-24 contracting year, starting beet sugar prices were in the range of $0.54 to $0.58 per pound f.o.b. in the Midwest, a 35% increase from the 2022-23 contracting year. ASR/Domino offered refined cane sugar at $0.59 per pound f.o.b. from its Northeast and West Coast refineries.

159.    Despite adequate sugar supplies, parallel price increases continued throughout the year for both cane and beet sugar. ASR/Domino increased to $0.60 per pound f.o.b. Northeast and West Coast in April 2023 for the 2023-24 contracting year. Beet sugar prices were firm in the $0.55 to $0.58 per pound range. In May, ASR/Domino increased its prices for 2024 to $0.61 a pound f.o.b. Northeast and West Coast and $0.59 per pound f.o.b. for Southeast and the Gulf.

160.    In October 2023, ASR/Domino offered its refined cane sugar for 2024 at $0.63 per pound f.o.b. from its Northeast and West Coast refineries.

161.    With the start of the contracting season for 2024-25 beginning in earnest in February 2024, buyers saw offers of $0.53 to $0.55 per pound f.o.b. in the Midwest while ASR/Domino offered bulk refined cane sugar at $0.60 per pound f.o.b. from its Northeast and West Coast refineries.

162.    Although sugar production in the United States set a new record in 2024, prices remained high throughout the year. There were reports at the end of the year that despite ample supplies, beet processors had no desire to lower prices to contract that sugar.

163.    The DOJ Findings of Fact in the merger case concluded that Defendants were "interdependent," meaning that if one Defendant raised prices, the others would similarly

raise prices in parallel. The DOJ further concluded that "Competitors closely monitor one another's pricing and sold positions" and that "[t]here is ample evidence that United and others recognize their strategic interdependence, accounting for price signals they send as well as receive. United sends messages or signals to competitors about pricing and consider how its own actions may cause market-wide prices to decline [or increase]." For example, United's CEO, Mr. Wineinger, explained a strategic decision whereby United "pull[ed] some older offers while sending a message to NSM and other competitors that we were not interested in allowing the market to slip lower. And United at times pulls its competitive punches for fear of prices dropping."

164.    The DOJ Findings of Fact further concluded that, just like United, "Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline. The DOJ Statement of Facts cited to Imperial's Henneberry expressing concern that lowering pricing "would be snatching something from United just as they are starting to show some upside price movement"; and Domino's Henderson explaining a decision not to get "aggressive" on pricing because Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." Domino's Robert Sproull instructed Mr. Henderson to "signal to the market" that there would be tightness and Domino would maintain price.

165.    As further evidence of parallel conduct, Domino bluntly stated that after the Imperial/United merger "[i]t's going to be more important than ever to stay close to United," and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener

47

industry. 2 players that account for ~65% of the industry..." Further, "[a]fter speaking with his 'trusted friend,' the Imperial's CEO, Domino's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's 'cane price approach,' which likely is a good thing for [Domino]."

166.    The parallel pricing resulted in dramatic overall increases in the sugar market. Pricing had reached a low point in February 2014. Prices then started trending upward for the most part, but at modest levels of progression. United employed Wistisen/Commodity at least as early as the first half of 2019 to enable it to fix or coordinate prices with ASR/Domino and Michigan. Then, commencing in or about October 2019, prices experienced one of the steepest climbs ever, which is ongoing, and by late 2023, cane sugar prices were at their highest levels since November 1974. During that period, the Producer Price Index ("PPI") calculated by the Federal Reserve Bank of St. Louis went from 87.6 to 97.4. After United's acquisition of Imperial in 2023, prices further increased, going from a PPI of 110.6 to 123.2 by the end of 2023.

167.    The following chart depicts the PPI for the Granulated Sugar Manufacturing sector during the Class Period and the five years preceding it.



PPI industry data for Sugar mfg, not seasonally adjusted

Click and drag in the plot area to zoom in. Hover over chart to view data.
Source: U.S. Bureau of Labor Statistics.

### D.    Additional Plus Factors Support the Existence of a Conspiracy

168.    In addition to the direct evidence of unprecedented price increases and extensive information sharing by the Producer Defendants commencing with the engagement of Commodity and Mr. Wistisen, as well as the dramatic price increases imposed by each of the Defendants during the Class Period, there are other economic factors, also known as "plus factors" in antitrust parlance, that support an inference of collusion.  Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," that thus support an inference of a conspiracy.[9]    The exchange of private, competitively sensitive information among

---

[9] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

competitors, as described above, is a plus factor that strongly supports an inference of collusion.

169.    Here, in addition to the information sharing, plus factors that further support an inference of collusion include:  (a) sugar industry consolidation and concentration, (b) high barriers to entry, (c) inelastic demand, (d) high vertical integration, (e) opportunities to collude, (f) the fungible, commodity nature of Granulated Sugar, and (g) a history of antitrust violations by sugar manufacturers, including a number of the Producer Defendants and/or their predecessors.

### 1.    The Market is Highly Concentrated, and the Defendants Are the Dominant Firms.

170.    Prior to U.S. Sugar's acquisition of Imperial in 2022, the top three marketers of sugar in the United States accounted for 65% of the market.[10]

171.    While the Producer Defendants dominate the industry, none of the remaining producers of Granulated Sugar have had a market share that remotely approaches that of the Producer Defendants.

172.    Furthermore, the industry recently became even more concentrated when United acquired Imperial in 2023, resulting in a substantial increase in dominance by ASR/Domino and United.

---

[10] American Crystal Sugar Company, *A Testament to the Limitless Potential of Growers*, https://www.crystalsugar.com/our-company/cooperative-profile/#:~:text=Market%20and%20Competition,and%20The%20Western%20Sugar%20Cooperative.

### 2.    Barriers to Entry Are High.

173.    There are high barriers to becoming a manufacturer of Granulated Sugar. The start-up capital necessary to compete with today's Granulated Sugar manufacturers would be, at least, in the millions. Granulated Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Granulated Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for USDA loans and production allotments that enable growers to process raw sugar into Granulated Sugar without competition from imports. United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs, limit foreign competitors entering the U.S. market that could otherwise serve as a competitive restraint on Producer Defendants.

### 3.    Demand for Sugar is Inelastic.

174.    Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.

175.    Demand for Granulated Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. Defendants recognize that Granulated Sugar demand is inelastic. The Producer Defendants knew that they could demand higher prices when less Granulated Sugar was available to sell. As a result, they routinely exchanged information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Granulated Sugar.

### 4.    Defendants Are Vertically Integrated.

176.    The Granulated Sugar industry is almost entirely vertically integrated. In the Granulated Sugar industry, "vertical integration" means the Granulated Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Granulated Sugar in their own refining facilities, and selling their Granulated Sugar to direct purchasers. A consolidated market with vertically integrated participants is a structural characteristic that makes an industry conducive to collusion.

177.    The President and CEO of Imperial Sugar prior to its acquisition by United States Sugar testified that it was difficult for Imperial to compete with the other Granulated Sugar producers because it was not vertically integrated. Until Imperial was acquired by United States Sugar, it did not grow sugar cane or have direct access to domestic raw sugar cane in the United States.  Imperial had to import raw cane sugar to manufacture Granulated Sugar. As a result, Imperial's costs were typically higher than the other Granulated Sugar producers.

### 5.    Defendants Had Numerous Opportunities to Collude.

178.    In addition to sharing information through Wistisen and disseminating public statements to competitors, Defendants had opportunities to collude through annual meetings of the ISC, which is run by the International Dairy Foods Association ("IDFA") and is held in February of each year.

179.    The IDFA has characterized the purpose of the ISC as follows: "[t]he Colloquium draws hundreds of professionals and decision-makers from the sweetener

industry and from companies that use sweeteners in the products they make. Buyers, processors, refiners, distributors, and food companies actively participate in the Colloquium, using it as a springboard to enhance their business and trading-partner networks."

180.    Due to the COVID-19 pandemic, the ISC meeting was not held in person in 2020-2021, but resumed in person in 2022 and the years that have followed. Representatives of Defendants attended each of the ISC's meetings held in 2019 and 2022-24. At the 2019 session, to offer one illustrative example, there were extensive presentations of the factors that would dictate future sugar prices during the upcoming year.

181.    Discussions on the sidelines of the ISC are a prime opportunity for collusion. During the past few years, the event has served to kick start sales for the following year. For example, in 2022, future contract prices for Number 16 sugar were discussed at the ISC and then finalized in the weeks following the event. These prices in turn were used to estimate Number 16 sugar futures, which in turn could be used to develop actual Number 16 spot prices during 2022 and 2023. Further discussion of pricing developments following ISC meetings is presented in Section IV(C)(4), above.

182.    In addition to participating in the ISC, the Producer Defendants each are members, either directly or through one of their affiliated companies, of various trade associations such as the Sugar Association and the American Sugar Alliance. The Producer Defendants, directly or through their affiliates, hold board positions on these trade associations. For example, the Board of the Sugar Association includes Pepe Fanjul (ASR/Domino), Mike Greear (Wyoming Sugar Company, one of the member-owners of

United), Matt Hoffman (Sugar Cane Growers Cooperative of Florida, parent company of ASR), Neil Juhnke (Michigan Sugar), Peter O'Malley (ASR/Domino), Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino), and Kurt Wickstrom (Minn-Dak, one of the member-owners of United).[11] These memberships afford them opportunities to collude during the Class Period.

183.    Further, the crossover of employees among the Defendants provided additional opportunities to collude or exchange competitively sensitive information. For example, ASR/Domino's director of national accounts, Adam Whittaker, ASR/Domino's national accounts manager, Brian Dahlman, and United's director of strategic accounts, Eric Speece, were each former employees of Cargill. Mr. Whittaker worked at Cargill for more than a decade before joining ASR/Domino, while Mr. Speece worked at Cargill for about nine years prior to joining United. Both Mr. Whittaker's and Mr. Speece's employment at Cargill overlapped for a five-year period. Mr. Whittaker, Mr. Speece, and Mr. Dahlman were all involved in the exchange of competitively sensitive information as described in the email exchanges detailed herein.

### 6.    Granulated Sugar is a Commodity.

184.    As detailed above, Granulated Sugar is a fungible commodity. Coordination is easier with a commodity product because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are

---

[11] The Sugar Association, *Board Members*, https://www.sugar.org/about/board/ (last visited Nov. 12, 2024).

more likely to reflect cheating on the conspiracy than some kind of custom arrangement.

185.    Futures contracts for domestic raw cane sugar and "White Sugar" (symbol "W") are traded on the Intercontinental Exchange ("ICE") alongside other commodity products such as wheat, crude oil, and gold.[12] Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service. The commodity nature of Granulated Sugar helps to facilitate cartel behavior.

186.    Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer affect the market price for Granulated Sugar.

187.    In sum, the Granulated Sugar industry has characteristics that ensure the exchanges by Defendants of competitively sensitive, non-public, material internal information are highly anticompetitive. The exchanges allowed the Producer Defendants to raise, fix, maintain, or stabilize Granulated Sugar prices during the Class Period. As a result, Defendants' unlawful conduct caused Plaintiffs and members of the Classes to pay artificial prices for Granulated Sugar during the Class Period. These prices exceeded the amounts they would have paid if the prices for Granulated Sugar had been determined in a competitive market. Plaintiffs and members of the Classes suffered antitrust injury because of Defendants' conduct.

---

[12] ICE, *Products – Futures & Options*, https://www.ice.com/products/Futures-Options/Agriculture (last visited Nov. 12, 2024).

### 7.    There is a History of Anticompetitive Conduct in the Sugar Industry.

188.    The sugar industry in the United States has long been plagued by anticompetitive practices, with violations of antitrust laws dating back nearly a century. This historical pattern of misconduct serves as a backdrop to the present conspiracy, highlighting the industry's susceptibility to collusion and the Defendants' deliberate perpetuation of these unlawful practices.

189.    **1930s: The Sugar Institute Case.** For example, in the 1930s, the United States Supreme Court addressed the antitrust violations of the Sugar Institute, a trade association for sugar manufacturers.[13] The Court upheld findings that the Sugar Institute engaged in collusion by mandating advance price announcements and strict adherence to those announced prices and terms. These practices stifled competition and allowed manufacturers to control the market, setting a precedent for subsequent antitrust enforcement in the sugar industry.

190.    **1948: American Crystal Sugar and Uniform Pricing Agreements.** The anticompetitive tendencies of the sugar industry resurfaced in 1948 when the Supreme Court examined the activities of American Crystal Sugar, now part of Defendant United.[14] The case centered on agreements among California sugar refiners to pay uniform prices for sugar beets. The Court condemned this arrangement, noting its far-reaching monopolistic effects. By eliminating price competition among refiners, the agreements deprived sugar

---

[13] *United States v. Sugar Institute*, <u>297 U.S. 553, 582</u> (1936).

[14] *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, <u>334 U.S. 219, 221</u> (1948).

beet growers of any competitive opportunity, increased market control over sugar sales, and entrenched a monopolistic structure. The Court's decision underscored the inherent dangers of collusion in the sugar industry and its devastating effect on competition.

191.    **1970s: Broker-Facilitated Price Fixing.** In the 1970s, the DOJ uncovered another collusive scheme involving sugar refiners, including California & Hawaiian Sugar Company (later acquired by Defendant ASR/Domino) and American Crystal Sugar Corporation (part of Defendant United). The sugar refiners were accused of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing.[15]

192.    This led to a 1978 consent decree prohibiting such conduct, including direct communications about future prices and the use of intermediaries to facilitate price discussions. Despite these prohibitions, the practices described in the decree bear striking similarities to the conduct alleged in this case.

193.    **Private Litigation and Settlements.** The DOJ's actions in the 1970s sparked multiple private class action lawsuits on both coasts of the United States, where courts certified classes of affected consumers. These cases ultimately settled, further illustrating the pervasiveness of anticompetitive practices in the sugar industry and the widespread

---

[15] *United States v. Great Western Sugar Co., et al.*, Case No. 74-2674-SW at ¶ 1415 (N.D. Cal. Dec. 19, 1974) (complaint brought by the United States in 1974 against Great Western Sugar Company, American Crystal Sugar Company (now part of United), Amalgamated Sugar Company, and other sugar refiners).

harm inflicted on consumers.[16]

194.    The history of antitrust violations in the sugar industry reveals a consistent pattern: sugar producers and refiners have repeatedly used information exchanges and pricing agreements to suppress competition. The Defendants' conduct in the present case is a continuation of this troubling legacy, exploiting structural vulnerabilities in the industry to agree upon and maintain artificially high prices for Granulated Sugar.

### E.    Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act

195.    Competition is harmed when, as here, competitors with market power in a concentrated market exchange confidential, strategic information about current and forward-looking plans for prices and supply. Price, capacity, supply, and costs are crucial aspects of competition. Information exchanges advance competitors' ability to collude.

196.    It is long-held Supreme Court precedent that exchanges of competitive information among competitors may independently violate Section 1, even without an express agreement to fix prices.  "Exchanges of current price information . . . have the greatest potential for generating anti-competitive effects and . . . have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co*., 438 U.S. 422, 441 n.16 (1978); *see also Todd v. Exxon*, 275 F.3d 191, 211 (2d Cir. 2001) (same). "By the same reasoning, exchanges of future price information are considered especially anticompetitive." *Todd*, 275 F.3d at 211. "Genuine competitors do not make daily, weekly,

---

[16] *See In re Sugar Indus. Antitrust Litig*., 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar Indus. Antitrust Litig*., MDL No. 2201, 1976 WL 1374 (N.D. Cal. May 12, 1976), *mandamus denied*, 559 F.2d 481 (9th Cir. 1977).

and monthly reports of the minutest details of their business to their rivals . . . ." *American Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921); *see also United States v. Container Corp. of Am*., 393 U.S. 333, 336–38 (1969) (information exchange of price data among competitors unlawful despite absence of agreement to adhere to a price schedule where the exchange had an anticompetitive effect in the industry).

197.    The Second Circuit has explained, "'[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication.'" *Todd*, 275 F.3d at 199 (2d Cir. 2001) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). "[E]xchanges of current price information have the greatest potential of creating anticompetitive effects and have consistently been held to violate the Sherman Act."[17]

198.    The DOJ has stated that information exchanges with direct competitors raise serious antitrust concerns:

> [T]he sharing of information related to a market in which … the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of

---

[17] *In re SSA Bonds Antitrust Litig.*, No. 16 Civ. 3711 (ER), 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) (citing *Gypsum*, 438 U.S. at 441 n.16).

information relating to less competitively sensitive information.[18]

199.    The DOJ has recently demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, the DOJ withdrew antitrust policy statements that provided safe harbors for sharing pricing or cost information, concluding that the policy statements were "*overly permissive* on certain subjects, *such as information sharing*, and no longer serve[d] their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment." In December 2023, the Federal Trade Commission and DOJ jointly withdrew the Antitrust Guidelines for Collaboration Among Competitors, and explained that "[t]he Agencies are committed to vigorous antitrust enforcement on a case-by-case basis in the area of competitor collaborations because such collaborations can harm competition and subvert the competitive process."[19]

200.    The DOJ's most current analysis of information sharing and price-fixing is found in its *amicus* brief filed on October 1, 2024 in *In re Pork Antitrust Litig.*, No. 0:18-cv-01776-JRT-GFD (D. Minn.) (ECF No. 2616). In that brief, the DOJ explained that information sharing by itself can violate the antitrust laws:

---

[18]    Fed. Trade Comm'n & U.S. Dep't of Just., (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

[19]    Justice Department and Federal Trade Commission Withdraw Guidelines for Collaboration Among Competitors, https://www.justice.gov/atr/media/1380001/dl?inline.

As relevant here, competitors' exchange of competitively sensitive information is itself a form of concerted action that can violate the antitrust laws. As the Supreme Court explained in *United States v. Container Corp*., reciprocal information exchange among competitors is "concerted action [that] is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." 393 U.S. 333, 335 (1969) (emphasis added). This is so even when the participants have the "freedom to withdraw from the agreement" and when the exchanges are "infrequen[t] and irregular[]." Id.; see, e.g., *Todd [v. Exxon Corp.], 275 F.3*d [191] at 198 [(2d Cir. 2001)] (Sotomayor, J.)] (recognizing that an "information exchange itself" can form a claim under Section 1).

*Id*. at 5-6.

201.    With respect to a stand-alone information exchange, the DOJ went on to say: "Standalone information-sharing claims are evaluated under the rule of reason . . . If information sharing tends to harm competition based on the full factual circumstances, 'liability follow[s].'" *Id*. at 7-8 (quoting *United States v. Gypsum Co*., 438 U.S. 422, 446-47 n.22 (1978)).

202.    The DOJ also reiterated that information sharing can also support the inference of a price-fixing conspiracy, as Plaintiffs have also alleged here, explaining:

Information exchanges can be relevant to concerted action in a second way: An information exchange among competitors can support an inference that a price-fixing or output-restriction agreement exists. Plaintiffs therefore regularly rely on information exchanges as evidence of a conspiracy to fix prices or restrict output. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (recognizing that information exchanges can serve as a "plus factor" suggestive of a price-fixing conspiracy); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1151 (8th Cir. 1979).

*Id*. at 5-6. In such circumstances, the per se rule of antitrust liability applies.

203.    Indeed, the "[e]xchange of disaggregated data can harm competition even if the individual firms are not explicitly identified, and the United States has obtained consent

decrees in recent years with firms that shared disaggregated information without directly identifying individual competitors." *Id*. at 12 n.9.

204.     Here, Defendants' information exchange existed for the purpose of increasing prices of Granulated Sugar above competitive levels and aiding the Producer Defendants in abusing their market power to suppress price competition.

205.     Defendants' information exchange took place in secret and involved the exchange of confidential, current, and forward-looking information.

206.     Further, as alleged above, Defendants' information exchange occurred in markets with characteristics that make it particularly likely that such an exchange will have anticompetitive effects, including markets with inelastic demand, relatively few sellers, and a fungible product, for which competition is price-based.

207.     As a result, as alleged above, prices for Granulated Sugar rose significantly during the Relevant Period.

208.     There is no legitimate procompetitive justification for Defendants' conduct.

209.     Defendants' information sharing practices even violate a government policy—the Health Care Policy Statements—that the DOJ deemed "too permissive," demonstrating the particularly egregious nature of the conduct being challenged here.

210.     Defendants, through their use of Commodity and Wistisen to exchange non-public current and forward price and sales information, have caused direct anticompetitive effects across the nation in the form of higher prices to U.S. consumers, commercial indirect purchasers, and direct purchasers, such as Plaintiffs.

**F.    The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible**

211.    Defendants' anticompetitive scheme was not constrained by the USDA sugar program. This government program, established under the Agriculture and Food Act of 1981, is said to stabilize sugar prices domestically. Over the years, Congress has reauthorized the program, most recently with a minor adjustment in 2018, which increased loan rates for raw cane and refined beet sugar by 5%.

212.    While the USDA sugar program sets certain parameters for the domestic sugar market, it neither dictates **final** pricing nor shields producers from domestic competition. Instead, it provides mechanisms like price support loans, marketing allotments, and import quotas to maintain baseline sugar prices in the United States. However, these measures do not preclude the existence—or effect—of price-fixing conspiracies like the one alleged here.

213.    The price support loans offered by the USDA allow sugar processors to borrow against their inventory at predetermined rates. If market prices fall below these levels, processors can forfeit their sugar as loan repayment. Yet, during the Class Period, there were no forfeitures, indicating that market prices consistently exceeded the USDA's effective support levels.

214.    The Farm Service Agency (FSA) produces quarterly reports projecting whether the U.S. sugar stocks reported in the World Agricultural Supply and Demand

Estimates report are likely to lead to forfeitures.[20] The FSA's projections have concluded that forfeitures are unlikely for every quarter since March 2019.[21] This is supported by the FSA's national level database of loan forfeitures for all commodities, which lists no forfeitures for beet sugar, cane sugar, or in-process sugars since at least 2019.[22]

215.    The lack of sugar loan forfeitures since 2019 suggests that market prices have been above the effective support level since 2019. As a result, the loan program did not serve as a binding constraint on sugar prices, leaving ample room for Defendants to manipulate the market upward.

216.    The USDA also administers annual marketing allotments to cap the amount of sugar that processors can sell domestically for human consumption. While this mechanism seeks to prevent overproduction from depressing prices, it explicitly excludes limits on agricultural production or processing.

217.    During the Class Period, the allotments were consistently below domestic demand, indicating that they did not act as a binding limitation on sales or pricing. This environment allowed the Defendants to coordinate price increases under the guise of supply constraints.

---

[20] "USDA Announces No Actions under Feedstock Flexibility Program," *Farm Service Agency* (March 29, 2019), available at https://www.fsa.usda.gov/news-events/news/03-29-2019/usda-announces-no-actions-feedstock-flexibility-program. ("USDA's March 8, 2019, World Agricultural Supply and Demand Estimates report (www.usda.gov/oce/commodity/wasde) projects that fiscal 2019 U.S. ending sugar stocks are unlikely to lead to forfeitures.").

[21] FSA reports are released quarterly, with the most recent dated August 30, 2024. For all news releases, *see* https://www.fsa.usda.gov/news-events/news.

[22] "Loan Forfeitures – National Level," *Farm Service Agency*, available at https://apps.fsa.usda.gov/sorspub/reports/web/public/loan-forfeiture-national.

218. The USDA enforces tariff-rate quotas (TRQs) on imported sugar under the World Trade Organization's Uruguay Round Agreement. While these quotas protect domestic producers by limiting the amount of foreign sugar entering the market duty-free, they set minimum, not maximum, levels for imports. Throughout the Class Period, TRQs were close to these minimum levels, providing limited external competitive pressure to counteract the Producer Defendants' collusive pricing strategies.

219. The USDA sugar program does not actively regulate market prices for Granulated Sugar. Instead, it provides a framework that Defendants exploited to execute their conspiracy. By using information about supply limitations and production allotments, the Defendants created artificial scarcity and coordinated pricing in a manner that was neither compelled by nor consistent with the goals of the USDA program.

220. While the USDA sugar program establishes a supportive baseline for domestic producers, it does not authorize, facilitate, or necessitate price-fixing. The conspiracy alleged in this case operated independently of the USDA's regulatory framework, leveraging market dynamics to harm competition, overcharge consumers, and violate antitrust laws.

### G. Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs and Members of the Classes to Suffer Antitrust Injury and Damages

221. Because of the Defendants' anticompetitive conduct: (1) competition in the Granulated Sugar market has been reduced or eliminated, (2) prices for Granulated Sugar have been maintained at supra-competitive levels, and (3) United States purchasers of Granulated Sugar have been deprived of the benefit of price competition.

222.    As a result of the Defendants' anticompetitive conduct, Plaintiffs and Class members paid more for Granulated Sugar than they otherwise would have paid and thus suffered antitrust injury and damages. The overcharges paid by Plaintiffs and members of the Classes for Granulated Sugar constitutes antitrust injury and harm to competition under the federal antitrust laws.

## V.    LIMITATIONS AND TOLLING

223.    By equitable estoppel, Defendants' concealment of their unlawful conspiracy has tolled any applicable statutes of limitations for Plaintiffs and Class Members with respect to any claims and rights of action that Plaintiffs and Class Members have alleged in this Complaint.

224.    Plaintiffs and Class Members were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full scope of the Defendants' unlawful conduct could not have been discovered until the appellate exhibit volumes from the DOJ matter were made public on or about November 1, 2022.

225.    In addition, throughout the Class Period, the Defendants actively, effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs and members of the Classes, and the conspiracy was inherently self-concealing.

226.    Defendants promised to obey the law and act with integrity. For example, ASR Group's Code of Ethics and Business Conduct states in part, "ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its

operations." It further states that it seeks success "only . . . while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work." Regarding antitrust and competition laws, the Code states that ASR Group is "prohibited" from engaging in "agreements with competitors to fix or control prices," and that it "may not engage in direct or indirect discussions or contacts with competitors regarding . . . [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales[;] [t]erritories or markets in which products will be sold[;] . . . [and] [b]usiness, marketing or strategic plans."

227.    United's Code of Business Conduct and Ethics states that "[o]beying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents, and other representatives must respect and obey the laws of the cities, states, and countries in which we operate." It further states that "[w]e seek to outperform our competition fairly and honestly," and that there is an "obligation to protect [United's] assets [including United's] confidential information[.] Unauthorized use or distribution of United Sugars' confidential information is prohibited."

228.    Michigan Sugar's commitment to "Sustainability and Corporate Social Responsibility" states that the company "live[s] by our values – Excellence, Pride, Integrity, Compassion, and Trust. This is the foundation of a business environment that sets respect and dignity for coworkers, suppliers, customers, and partners as an absolute expectation."

229.    These promises to obey the law and behave with integrity prevented Plaintiffs and members of the Classes from discovering Defendants' conduct earlier.

## VI.    CLAIMS FOR RELIEF

**COUNT I:**
**PRICE FIXING**
**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**
**On Behalf of All Plaintiffs and Class Members**

230.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

231.    Defendants are direct competitors in the Granulated Sugar market throughout the United States.

232.    Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 to raise, fix, maintain, or stabilize Granulated Sugar prices. Since at least 2019, Defendants agreed with each other to exchange competitively sensitive non-public information regarding prices, output, and costs in order to raise, fix, maintain or stabilize the prices of Granulated Sugar. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States.

233.    Pursuant to the agreement, the Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Granulated Sugar sold to Plaintiffs and members of the Class.

234.    This conduct is unlawful under the *per se* standard. Defendants' conduct is

also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

235.    Plaintiffs and the Class Members are threatened with future injury to their business and property by reason of Defendants' continuing violations of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

236.    Plaintiffs and the  Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.[23]

**COUNT II:**
**UNLAWFUL INFORMATION EXCHANGE**
**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**
**On Behalf of All Plaintiffs and Class Members**

237.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

238.    For purposes of this Count, which is based upon a claim subject to a Rule of Reason analysis, the relevant geographic market is the United States, and the relevant product market is Granulated Sugar. The Producer Defendants now have a collective 72% of the Granulated Sugar market and thus possess market power within it.

---

[23] Direct Purchaser Plaintiffs also seek monetary damages pursuant to the Sherman Act, and the Commercial and Consumer Indirect Purchaser Plaintiffs also seek monetary damages and other relief available to them under state law, which will be alleged in their respective Short-Form Complaints, by Order of the Court.  *See* ECF No. 315.

239.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States to or at supra-competitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States to or at supra-competitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

240.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to artificially raise, fix, maintain, or stabilize prices of Granulated Sugar sold in the United States to Plaintiffs and Class Members to or at supra-competitive levels.

241.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

242.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

            a.  Price competition in the sale of Granulated Sugar has been restrained,

suppressed, and/or eliminated in the United States;

b.  Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States; and

c.  Plaintiffs and the Class Members have been deprived of the benefits of free and open competition.

243.   Plaintiffs and Class Members have been injured and will continue to be injured in their businesses or property by paying more for Granulated Sugar purchased indirectly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

244.   Plaintiffs and the  Class Members are threatened with future injury to their business and property by reason of Defendants' continuing violations of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

245.   Plaintiffs and the Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.[24]

---

[24] Direct Purchaser Plaintiffs also seek monetary damages pursuant to the Sherman Act, and the Commercial and Consumer Indirect Purchaser Plaintiffs also seek monetary damages and other relief available to them under state law, which will be alleged in their respective Short-Form Complaints, by Order of the Court.  *See* ECF No. 315.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request judgment against Defendants, as follows:

A.      That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violations of Sections 1 and 3 of the Sherman Act;

B.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

C.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

D.      That Plaintiffs and the Classes recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

E.      That Plaintiffs and the Classes be awarded such other and further relief as the case may require and the Court may deem just and proper.

Dated:  February 27, 2025                    Respectfully Submitted,

*/s/ Daniel E. Gustafson*
**GUSTAFSON GLUEK PLLC**
DANIEL E. GUSTAFSON (#0202241)
DANIEL C. HEDLUND (#0258337)
JOSHUA J. RISSMAN (#0391500)
ABOU B. AMARA, JR. (#0401146)
GABRIELLE M. KOLB (#0504386)
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
jrissman@gustafsongluek.com
aamara@gustafsongluek.com
gkolb@gustafsongluek.com

*/s/ Michael L. Roberts*
**ROBERTS LAW FIRM US, PC**
MICHAEL L. ROBERTS
ERICH P. SCHORK
SARAH E. DELOACH
1920 McKinney Ave, Suite 700
Dallas, TX  75201
Telephone: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
sarahdeloach@robertslawfirm.us

***Appointed Interim Plaintiffs Steering
Committee Members and Co-Leads for the
Direct Purchaser Plaintiff Subgroup***

*/s/ Heidi M. Silton*
**LOCKRIDGE GRINDAL NAUEN PLLP**
HEIDI M. SILTON (#025759X)
JESSICA N. SERVAIS (#0326744)
JOSEPH C. BOURNE (#0389922)

ANTONIA M. KONKOLY (#0504377)
MICHAEL J.K.M. KINANE (#0504621)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  612/339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
amkonkoly@locklaw.com
mjkmkinane@locklaw.com

*/s/ Kimberly A. Justice*
**FREED KANNER LONDON
& MILLEN LLC**
KIMBERLY A. JUSTICE
JONATHAN M. JAGHER
923 Fayette Street
Conshohocken, PA  19428
Telephone:  610/234-6486
kjustice@fklmlaw.com
jjagher@fklmlaw.com

**FREED KANNER LONDON
& MILLEN LLC**
MATTHEW W. RUAN (#033909X)
DOUGLAS A. MILLEN
ROBERT J. WOZNIAK
100 Tri-State International, Suite 128
Lincolnshire, IL  60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
rwozniak@fklmlaw.com

***Appointed Interim Plaintiffs' Steering
Committee Member and Co-Lead Counsel for
the Commercial Indirect Purchaser Plaintiffs
Subgroup***

74

*/s/ Stacey P. Slaughter*
**ROBINS KAPLAN LLP**
STACEY P. SLAUGHTER (#0296971)
CAITLIN E. KEIPER (#0504799)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181
sslaughter@robinskaplan.com
ckeiper@robinskaplan.com

**ROBINS KAPLAN LLP**
ELLEN G. JALKUT
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
Telephone: 212-980-7400
Facsimile: 212-980-7499
ejalkut@robinskaplan.com

*/s/ Peter A. Barile III*
**LOWEY DANNENBERG, P.C.**
VINCENT BRIGANTI
PETER ST. PHILLIP, JR.
PETER A. BARILE III
SITSO BEDIAKO (#0389073)
NICOLE A. VENO
44 South Broadway, Suite 1100
White Plains, NY  10601
Telephone: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
pstphillip@lowey.com
pbarile@lowey.com
sbediako@lowey.com
nveno@lowey.com

*/s/ Elizabeth A. Fegan*
**FEGAN SCOTT LLC**
ELIZABETH A. FEGAN
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Fax: (312) 264-0100

75

beth@feganscott.com

***Appointed Interim Plaintiffs' Steering Committee Members and Co-Lead Counsel for the Consumer Indirect Purchaser Plaintiffs Subgroup***